Good morning. May it please the court, my name is Francis Fanning and I represent the appellant in this case, John Crowley. Mr. Crowley has been an inmate in the Nevada Correctional System for a number of years. He has a number of different medical conditions, one of which is bipolar disorder, and at one point the of lithium, but when he was moved from the facility where he was getting three doses a day to another facility, they changed his dosage. Well, they didn't change his dosage, they changed the number of times he got it, from three to two, but the dosage was the same. Well, I'm not a medical doctor, but in terms of the number of milligrams, yes, that was true. How that administration of two doses a day rather than three, how that affects the efficacy of the medicine, I don't know. Well, the medical report in the record says it doesn't affect from one of the doctors. That was from Dr. Bannister, yes. And there was no rebuttal evidence to that conclusion by that doctor? Well, Your Honor, that gets to the real essence of what's going on in this case. And what's fundamentally unfair in this case is the fact that Mr. Crowley, who's a prisoner, who's unrepresented, and who's trying to plead his case to the Court, was forced to respond to a motion for summary judgment without any of the benefit that most civil litigants would have in preparing to make that response. The State filed a motion to dismiss. First of all, the State took almost four months from the time that they were given the complaint to the point at which they filed this motion. And they filed it and called it a motion to dismiss, which clearly would have required them to assume the truth of everything in Mr. Crowley's complaint. But they didn't file it really as a motion to dismiss. They filed it as a motion for summary judgment, with all kinds of affidavits knocking off one after another of the individual defendants that Mr. Crowley had named. The only one that wasn't addressed in their motion was Dr. Sussman, who they had not accepted service for. Apparently, Dr. Sussman is not an employee of the State. Kagan. So one thing about that, which is that apparently judgment was entered against Dr. – against Crowley with regard to Dr. Sussman, although Dr. Sussman was never served. Yes. That doesn't seem possible, since Dr. Sussman was never in the case. I'm sorry. Otherwise, I don't understand how you could have a judgment against, at least without prior notice, against – with regard to somebody who was never served in the case. Well, Your Honor, the only way that the Court could have entered judgment regarding Dr. Sussman would have been to dismiss the claim against him without prejudice. And so the error was dismissing him with prejudice when it should have been without   I guess I would say that the error was dismissing him without giving Mr. Crowley the opportunity to amend his complaint and to explain to the Court what the problem was with serving Dr. Sussman. Unfortunately, I wasn't involved in the matter in the lower court. And the reason that seems to matter is that he seems to be the one person who we know actually was involved in all this. As to whom – or at least the critical person. I'm sorry? He seems to be the critical person here. Yes. And as to the rest, let's assume for the moment that absent another reason to dismiss him, to dismiss the complaint, there should have been a leave to amend to add people. I guess there was a – but what about the fact that no matter who the defendants were, there was still a failure of proof with regard – or was there still a failure of proof with regard to the medical question of whether there was actually any deliberate indifference here? Well, the only evidence regarding the medical question that supports Mr. Crowley's physician is the fact that his dosage was changed by Dr. Sussman and their dosage was changed by Dr. Sussman.  was forced to address that issue. It doesn't seem to be a medical explanation for that. But the real problem – Well, yes, but that only matters if it matters, i.e., if it had anything to do with what happened to him. In other words, it may be that there was no medical explanation for it, but it may be it was no harm, no foul, or it was foul because he got – he was in bad condition, but not – we don't know – have any reason to know that it was for that reason. Well, that's what makes this whole thing so unfair, is that Mr. Crowley was forced to address that issue without having the benefit of an answer to his complaint, an initial disclosure, identification of expert witnesses, any kind of opportunity to get responses to discovery requests. And why was that? It was because he didn't understand how Rule 56d allows a litigant to ask the court to postpone ruling on summary judgment at that early stage of the case. What happened, essentially, was – Can I ask you – because I don't want to lose this point, and I'd like opposing counsel to perhaps answer it if you can. Do you know what date Crowley was transferred from one facility to the other? Do you know the date of that transfer? I believe it's in the medical records. It might not be the exact date, but the approximate date. That would be the date that he was first seen by the medical folks at the new facility? Yes, the excerpts at – let's see. Thank you. Where are you getting that from? Sorry to – At LCC? Yes. And I'll also exhibit A to Docket 18-1, which are the records that show Crowley. Thank you. So – and I have a factual question, too. Aside from the two doses, one dose question, I thought there was a second claim perhaps of deliberate indifference as to delay in getting assistance once he started exhibiting symptoms. Now, I mean, at some point he started acting quite quickly, but I couldn't tell whether you thought there was a several-day delay before that. Well, his allegation was that his problems began, I believe it was on May 20th, and that he was taken – the record shows that he was admitted to the hospital in – I'm sorry, May 10th. May 10th. May 10th of 2009. That's when he was acting a bit bizarrely, according to his cellmate or someone in prison. And when did he go to the hospital? He went to the infirmary for observation on May 16th, according to the medical records at – the appellant's excerpts at page 20, says doctor. Is it possible – are you contending that there was deliberate indifference in that period, or do we not know whether anybody knew about it or what? Well, if they knew about it, if they knew about the bizarre behavior and waited for six days to even put him in the infirmary, then that could constitute deliberate indifference. Except there would have to be some downside to it. We don't know if there was. It could have been. I'm sorry? There'd have to be some injury due to the delay, right? Well, yeah. Because this isn't like – I mean, this isn't like he's in terrible pain or something. So there had to be some injury due – some detriment to him from the delay. There may have been, but – Yes. Well, and again, that becomes a medical issue that he never had any chance to explore, other than to say what the experience was like for him. But what I want to know is, is the problem – is the – when you say if they knew about it, did he allege whether they knew about it? Whether some person knew about it? Some – some administrative person? Yes. The problem was that he didn't have the right individuals. He didn't know which person. So could the amended complaint have made a difference with regard to that issue as opposed to the issue of the dosage change? Well, it could if he – if he was able to determine who the person was that knew as of May 10th that he was having these problems. If that individual didn't do anything about it and it took another individual six days later to – But he did allege that there was somebody, he just had the wrong person? Yes. In his complaint, he was alleging individuals that he thought were the right people. As to that question? Yes. Okay. And in the motion – An unknown person. We don't know who that is. He does not identify who that person is. No. I think – my recollection is that he said his cellmate advised somebody. Somebody. Correct. That's what the record shows. The problem is he was incoherent, apparently, at the time or suffering enough debilitation that it would be understandable. Nothing in the record to suggest Dr. Sussman was that person. Oh, no. No. But the people who were dismissed out of the case, their arguments were all, it wasn't me. The state didn't take the position that it didn't happen. They went through and took the individuals and said, okay, when were you on duty? Did you experience this event? Did you report it? That type of thing. And so because he named specific individuals that weren't the right individuals, they were dismissed out of the case and he wasn't given any opportunity to do some of the things that the individuals were who were on duty at the time and so forth. Okay. Thank you very much. Pardon? Thank you very much. All right. Thank you, Your Honor. Judge Alicon, Judge Berzon, Judge Zuri, good morning. May it please the Court, my name is Clark Leslie. I'm with the Senior Deputy Attorney General's from the office of that office in Nevada. I represent the appellees in this case. I would like to highlight some points that the questioning from the court, I think, go to the essence of this case. First of all, there is no evidence that there was deliberate indifference. At worst, you can make a case for a lack of due care and that is should Dr. Sussman or others have evaluated the status of the lithium in this inmate's body at the time he was transferred from one point to another. He first received the lithium on February the 3rd while he was at Lovelock Correctional Center. And there was a recommendation that there be a follow-up sometime in the three-month region. Well, three months occurred right around the beginning of May. And so he was due for some kind of a review at that time, but he had just gotten to the new prison. One problem is, is that the effects of lithium toxicity closely mirror bipolar situations and problems with individuals. So that when his cellmate says to one of the correctional officers, Crowley's acting a bit funny, a little bit bizarre, that was not out of character for him. We have a time period of May the 10th when this was first brought to their attention. Was eating soap a bit bizarre? That is bizarre, even for Mr. Crowley. And that got their attention. And that's why there was, you know, a timeline of the following. On May the 16th, he was taken to the infirmary. And then finally, when they did the blood draw, they determined on May the 18th that it would be appropriate to send him to the emergency room at Valley Hospital. So we are talking about a period of around eight days. Now, as Your Honor pointed out, Judge Berzon, under the Shapley case, you cannot have an actionable claim for a delay in treatment unless you can establish that there was an increase in injury or damage to the individual attributable to the delay. There's nothing in the record that shows that. Also, upon questioning by this Court of the Court of Appeals, there was a delay   But we can assume that, on May 10th, maybe he wouldn't have ended up in a coma. We won't know. But what we do know is what the only doctor in this case who has testified has told us. And that is, once the lithium buildup occurs, you can expect certain very bad things to happen. The dosage itself had not changed. As you pointed out, Judge Agiore, it was only the time period in which it was provided. The best explanation that we have, for one thing, it was for the improper exhibit that was provided by my esteemed colleague regarding lithium, which is bolstered by the declaration from Dr. Bannister at this is Exhibit B at 18.1, docket 18.1. He points out that a combination of things like the presentation of lithium into the body together with dehydration, an improper intake of sodium, dieting and a few others can contribute to a lithium buildup, so that instead of the body properly taking the drug and flushing it out in due course, it remains in minute amounts, so that over a period of time, you have an improper buildup in the body. Kagan. Kagan. Can you explain the procedural sequence here? I gather that your opponent is contending that, at least in the prisoner context, there is to have an immediate motion for summary judgment like this before there's any chance for discoveries, essentially, to skew the system from what civil litigation ordinarily assumes. How did that happen, and is there something we should be concerned about more generally? I don't have to educate the Court on the fact that Rule 56 provides for a litigant to request leave of the court to conduct discovery. Right. That was not done in this case. So I guess, I'm guessing, is the question whether or not there should have been notification to the inmate that he had this opportunity. We have pointed out in our brief, I think rather extensively and hopefully persuasively, that enough assistance is already provided to inmates, and that if we go any further, it is very unfair to parties that are opposing impropers. We already provide them under Rand and Klingley. But it's particularly disturbing. I mean, this is kind of a perfect storm of problems, because you have a person who, by definition, was not coherent at the time that these things were happening. And he's being faulted for not knowing exactly who the people were who were involved, which would have been simple enough to ascertain if somebody had simply told him, which presumably you could have done. And instead, what you're doing is saying, oh, it's not him, it's not him, you know. And so therefore, we get summary judgment because you have the wrong people. And yet, Your Honor, and yet, when he filed Docket 35, the last of the amended pleadings that he filed, he identified the right persons without discovery. He had the tools he had. And he said, oh, but he shouldn't be able to put that in because it's too late. So that pleading is not actually in the record. Well, no. And if the reason why summary judgment was provided was because this person with bipolar disease named the wrong individuals, I would be promoting that the case go back. That would not be fair. The bottom line here, as we started out this discussion, is there is no liability. Regardless of who you point the finger at, as we look at the undisputed record, whether you identify the right nurses, the intake nurse, which was Orton instead of the wrong person that he identified, if we bring in Dr. Sussman, there is no evidence that anyone on the prison staff knew that a change in the daily  And, in fact, we don't even know that. In fact, Dr. Bannister, the only evidence in this record at paragraphs 14 through 16 of his declaration, provide us with probable reasons why the lithium toxicity situation occurred, and it had nothing to do with deliberate indifference. Before we let you go, I'd like to switch gears for a second because there's one issue I need you to address. And it's troubling me, frankly. And it's the service on the defendant. I'm sorry, let's try it again. I'm the pro se prisoner. The district court docket reflects that the notice that you say he received was actually returned undeliverable to him, and your opponent has cited the Seventh Circuit case of Horton. How do you get around Horton? But before you answer that, tell me if I'm wrong. I don't see on the docket that he received service, especially now that I know the date that he was transferred to the new facility and the date that the docket reflects it was returned undeliverable on May 2, back to the court. And then Rule 4M comes into play, and I don't see where the court made a show of force to cause something to the defendant to make sure the defendant knew with respect to Dr. Sussman he did not have service. And if all that I just said is true, do I have a choice but to remand back for an opportunity for the pro se prisoner to effect service? Sorry that took so long. No, no. And I appreciate the Court's concern about what's doing what is fair. First of all, this happens fairly frequently in terms of key mailings being returned due to the fact that inmates are transferred. It is my experience that they refile and resubmit those, and they do eventually get to the inmate. Do I know that that happened here? No. But in your brief, didn't you indicate that he did receive service? Well, what I indicated was that he received our notice that we had accepted service on behalf of everyone but Sussman. And so he knew that there was an incomplete service on Dr. Sussman, in the sense that if he read the document. So that's as good as it gets, I think. If he chooses not to act in the next 10 months between the time that he knew there was no service and the time that the motion was finally ruled upon, well, shame on him in view of the fact that he knew enough to file an amended complaint and cite the right people. But if, and I accept what you've just said, Horton then you would say is not good law, and we shouldn't follow it, because Horton is almost on point. And it says, without some notice from the Court, some proof on the record that an  And you have to either, you know, to show cause or get an extension or something. We don't have that here, do we? And how do I get around Rule 4M and how do I get around reversing on that point? Excuse me for interrupting, Your Honor. No. Because Rand and Clingley, I think, trump those. And when we're in a motion to dismiss, motion for summary judgment, that satisfies the notification requirements. I don't understand. It's a different notice, but a different thing. But it addresses the same subject, and that's letting an improper individual know the consequences of a dispositive motion that is before him or her. But it doesn't tell them that there was no actual service. No. But there is notification that you must serve defendants within 120 days, otherwise they can be dismissed from a lawsuit. And that is essentially what happened. But Rule M says you've got to do something more. Once that becomes apparent, you've got to allow the opportunity for the party to affect service by a show cause order or a notice or something to say, hey, you haven't complied, I'm going to dismiss unless you do something. And that's what's missing. Well, we agree that this individual had the time. We agree that this individual had the opportunity and probably good cause to seek for an additional amount of time. The question is whether or not notification from my office that all but one had been served satisfies that requirement that you point out. Well, I mean, even that notice is not notice that the other person wasn't served. That's right. So it's not the notice that's required by the rule. I would agree. It is not certainly technically within the letter of that law. But I think we're talking about a totality of circumstances here and what's fair for both sides. Okay. Thank you very much. Thank you, Your Honors. I thank both of you. The case of Crowley v. Bannister is submitted. And we will take a short break. Well, no, let's do one more case and then we'll take a recess. All right. United States v. Crowley.
judges: Zouhary, Alarcon, Berzon